Good morning. May it please the Court. Robert Shroth, Jr. appearing on behalf of the appellants in this matter. This case also involves a lawsuit stemming out of the alleging allegations violations of the CFA and the FDCPA. To get to the point, there were facts that were made available to the district court which clearly indicated that there was a genuine issue of material fact as to whether or not the appellants, Andy and Rebecca Thomasson, had standing to be specific whether or not they were monitored by the defendant, GC Services. They testified in their depositions that they had received a letter from GC Services and there was a number on that letter. Rebecca Thomasson had called the number on the letter in January, left a message, wasn't able to speak with anybody. She called back again. She was given a different number. And at that time, she received... How did she get that different number? I believe her husband had given her the number. And how did he get it? I'm not sure. It may have come from another letter that he had gotten. But he had received another letter. Yeah, it came from another letter that he had gotten. So he said, try this number. So she was able to get in touch with the real person. And during the conversation, the collector for GC Services elicited personal information from her, asked her account number, her name, phone number, address, and her bank account. During that conversation, she heard a clicking noise. Or she heard a sound that made her ask, is someone listening in to this conversation? And the GC Services collector unequivocally told her, yes. That was the answer, yes. At that point... Excuse me. Did we start with 15 minutes on the clock? We might have started with just 10. I think we're short-changing you here. I'm sorry. I should have noticed that. If you could add five minutes. Thank you. I guess along those lines, if I could reserve five minutes... Okay. We'll try to help you do that. Okay. Thank you, Your Honor. Then Mr. Thompson, who had also received a letter, called in April. Let me stop you right there. The brief of your opponent makes a point that the complaint alleges something quite different as to Rebecca. The complaint alleges that no one said anything at all during the conversation that she had about monitoring. How do you reconcile the allegations in the complaint with what she says in her deposition? Well, I think the deposition is more telling as to what happened. I don't recall as I stand here today whether it was a verified complaint. I looked for it. It didn't say verified. But I'm nonetheless troubled that I've got one thing in the complaint as an allegation, which I assume is made in good faith, and I assume that there's been some conversation with Rebecca before the complaint is drafted, and then we get a deposition that says something quite different. Well, it may have been a mistake on my part in the drafting, but the testimony that she gave was under oath, and she was subject to cross-examination about the phone call. She was taken painstakingly through the call, the facts leading up to it. During the inquiry, I imagine that her recollection had been refreshed as remembering certain facts, the details when the phone calls were made, how she went about it. I would submit that the deposition is more accurate because it's under oath, and I think because it was subject to cross-examination, it's more specific. Okay. Okay. So getting back to Mr. Thomson, Andy, if I may, he also had a telephone call in April, and they, again, the collectors, they being the D.C. Services, was eliciting personal information from him. They asked him basically the same questions, what his name was, his address, his phone number, I believe where he worked, his bank account, and the account number, of course. And at that point, he'd also heard a clicking sound. And then Mr. Thomson asked if someone was listening to the conversation as well, and at that point the collector said that D.C. Services records, or I should say monitors all calls was their answer. So there's clear evidence that their calls were monitored. Now, the district court ---- Now, again, I want to come back to what the red brief says. They say that his testimony is mildly inconsistent because in answer to an interrogatory, the interrogatory says that they said that the call was monitored and recorded. But that's not quite what he says in his deposition, correct? I believe that's correct. Yeah. So what am I to make of that inconsistency? Well, you know, I think when you're asked a question, I mean, just as I'm standing up here today, I don't know, you know, I'm giving you not the exact word. There may be a word that was out of place here or there. You know, when he went into the deposition, he didn't have his interrogatory response in front of him that he could cite word for word. And which is true, that they told him it was or it was not being recorded? Well, you know, I don't know which ---- I can't say which is true. I'm not ---- I can't step into his head. And I haven't actually picked up on that discrepancy until Your Honor brought it to my attention. Well, it's mentioned in the brief. Well. If you read the other side's brief, you should have picked it up. I did. But, I mean, I was looking at other issues in there. I think that the ---- I would say that it's more accurate that they didn't monitor, that they monitored all the calls. Because we've come to find out that they don't report. No, this is more accurate in terms of what he was told. I mean, the question is, what was his particular experience? And he says. He says that they monitor all calls. In his deposition. In his deposition, right. Is that really a violation of the FDCPA? Well, we're going to ---- I was going to get there, but we can go there right now. I'll come back. We're running out of time. So you haven't even talked about SIPA and what have you. Okay. All right. So just tell me why it's a violation. Okay. It's a violation because the 1692E has several enumerated examples. There's a list of what are and what are not violations. And 1692E10 is more akin to this case. And that prohibits the use of deceptive means to collect any debt or obtain information concerning a consumer. Those are violations. It says that. Now, the argument, then, is that failing to disclose that you're monitoring a telephone call, hiding the fact that someone else is listening to your call is deceptive. Why? Because it's hiding facts that are important. And the reason why it's important is because when consumers find out that their calls are being monitored or recorded by someone else, they have a tendency to hang up. They don't want to give out that information. And the debt collector's job is to get information so that he can use it against them later when they go to collect. Or, in some cases, when they have subsequent conversations with them, they said, well, you know, you told us, you know, that actually you weren't working. And then when we called back, your wife said you had a job. Well, you know, that's not true. How do you know that? Well, because we recorded it. You want me to play it back for you? Threats like that in order to intimidate them. That's why it's a violation. Why does it violate SIPA? Well, because it says so in the statute. Where does it say that monitoring is covered? Business monitoring. SIPA is covered under California Penal Code Section 1632, which states every person who intentionally and without the consent of all parties to a confidential communication by means of an electronic amplifying or recording device eavesdrops upon or records the confidential communications, whether the communication is carried on among the parties in the presence of another, et cetera, et cetera. So the purpose of SIPA is to specifically forbid monitoring or recording a conversation without a third party consent. It says, hold on, hold on. That's the wrong one. I thought, doesn't it, doesn't the statute. Oh, here we go. So 632D says the term person includes an individual business association, partnership, corporation. That's correct. There's no business exception to SIPA. Had Congress intended there to be one. SIPA is California. Yeah, that's correct. Why shouldn't we read business to mean a business monitoring its own calls isn't eavesdropping within the meaning of SIPA? We've got something in the PUC that seems to suggest that that's the proper reading of SIPA. Something, as I said, I think if they wanted to put a business exception in there, they would specifically say that, get to my notes on that specific issue. Well, you know, with this call, there are at least two parties to the call. And any unannounced auditor, whether a person or entity, is another person by definition. Well, Subdivision A says every person who intentionally without the consent of all parties to a confidential communication by means of an electronic eavesdrops upon or records the confidential communication shall be punished. It goes on and on, shall be punished by a fine. Then you go down, it says the term person includes an individual business association. Part of my trouble with reading that statute the way you want to do it is eavesdropping upon a confidential conversation. Well, I think it is a confidential conversation between the person whose debt is trying to be collected and the debt collecting company. But it's only another person of the debt collecting company who's listening in. So it's not an outsider to the confidential relationship. Well, but, you know, when you're speaking to someone on the phone, you understand that it's between you and me and not some other person. And so. But a person is defined to include a business association. Well, actually, a person is an individual, comma, or blah, blah, blah, blah. But, you know, when you have another person on the phone, then you have another party. And you need to have the consent of all the parties to have that on the phone. I mean, these third-party consent statutes have been interpreted by the courts before and routinely, you know, upheld. I looked at the Kearney case, for instance. The Kearney case involved recording, but that was a case where they were recording the calls interagency. And there was no, I mean, you know, those people were much smarter than me. And, you know, that argument was never, it wasn't raised because it wasn't tenable. I mean, the statute is clear. If they intended to have a business exception, they would have put it in there. Okay. Now, before your time runs entirely on you, do you want to talk about the sanctions order against Mr. Arleo? I do. I'd also like to talk about the cost issue as well. But let's, I think I can get through the Arleo issue quite well. There's a couple of points I want to make here. I don't believe that the conduct, Mr. Arleo's conduct in this particular instance violated Rule 11. The reason being is that I believe that the, his speech, his affidavit was protected under 28 U.S.C. Section 144, allowing the filing of an affidavit requesting a recusal on the basis of bias. And you could, there could be an argument raised that he didn't, it doesn't say that this is an affidavit challenging bias, but that's a form over substance. I mean, the substance of that, of what he said was questioning the judge's bias. Second point is I think there's a due process argument there. There was an order to show cause issue admonishing Mr. Arleo that he needed to appear on a no-bench warrant, and that any, with the notice of the potential penalty, was any pro hoc applications in any manner that may be assigned to the undersigned district judge, meaning Judge Burns. And the court must inform the clerk and request authorization. The actual ruling that came down was much, much harsher than that, especially in light of the fact that Mr. Arleo works around the country. He's not limited to New York. And apparently he never, but he never leaves New York. Well, he does. He drives. He drives. He drives. He also claims to be a teacher, a professor of law. He was a, he taught at the Thomas Jefferson School of Law. Which is in San Diego. That's correct. Okay. He does, he's all over. So he does leave New York. Oh, big time. He's all, he's everywhere. He's like John Madden. Yeah, exactly. He used to work for the airlines, and so he's got this phobia of flying, or he did some litigation. I'm not sure this is relevant. I know that Mr. Thomason is a graduate of the Thomas Jefferson Law School. Did they know each other when he was a teacher at Thomas Jefferson? I think that he may have taught his class. I also went to Thomas Jefferson, but I didn't know Mr. Arleo through that. I'm sorry. So, anyway, the, and so the ruling that came down was that he has to file, he has to give notice to the clerk of what happened in San Diego before he can make a pro hoc application in any district court, anywhere outside of New York, essentially. And so I think that had he had noticed that it was going to be so substantial, there were certain things he could have done. And the third point I wanted to make on that is that, well, to finalize the middle point, I think the penalty exceeds what was in the OSC. And lastly, I think that the sanctions are excessive. The Rule 11C4 authorizes sanctions to be limited to deter conduct. I think that, well, obviously that's happened, but I think that it's excessive to take a man's livelihood away like that, especially without the due process argument. Now, if I could quickly wrap up the cost issue, I think that was. It's covered quite well in your briefs. Why don't we hear from the other side? Okay. And we'll give you a chance to respond. Thank you, Your Honor. Thank you. Good morning, Your Honors. On behalf of Defendant and Appellee GC Services, Tom Gilbertson, Kelly Grindworn. Judge Burns's order below granting summary judgment rested entirely on a finding that in response to a no evidence motion for summary judgment, the plaintiffs came forward with insufficient evidence upon which a reasonable fact finder could rely in ruling for them. Where does he get standing? I'm sorry, Your Honor? Where does he come up with standing? They have no standing to proceed on behalf of anyone else once it's shown that they themselves have no evidence that they were monitored. I also want to emphasize while we're on that topic. Let me ask you that. Did he essentially try their case for them on the affidavits? No, Your Honor. They were obligated under the rule on summary judgment to come forward with all of their evidence. They were on fair notice that it was now time to do that. And all they had was their own declarations and their own testimony about what they had been told by, you know, an employee, a call rep working for GC Services, and they claimed that that was an admission. That's a question of law that I don't think they get that in as an admission, but it was evidence that was contradictory to a number of other statements they made. It's contradictory on summary judgment. You take the evidence in light most favorable to the non-moving party. Ordinarily you do, Your Honor, but under far- Ordinarily you always do. Well, no, Your Honor. Under far-out productions and a number of other Ninth Circuit cases, recognize that when all the plaintiff is coming forward with is their own testimony that is contradicted by prior deposition testimony or admission, such as the one in the complaint in this case, that's not sufficient to create a tribal issue. And if it was, summary judgment would never be granted. No, that's not true. Well, it would be very convenient for a plaintiff to simply come forward- What authority do you have? Let's go, I apologize for the informality of first names, but it's easier because the last name is Thomason. What authority do you have that we should disregard the sworn deposition testimony of Rebecca based upon an inconsistent statement in an unverified complaint? Well, there's the far-out productions case, which involved an affidavit contradicting deposition testimony. There are other cases in the Ninth Circuit- That's two pieces of evidence contradicting each other. Exactly right. And, of course, a complaint is not evidence. Well, one case is the United States v. One Parcel of Real Property, 904 F. 2nd, 487 492, Note 3. This is a Ninth Circuit case from 1990. A plaintiff's testimony may be enough to establish a genuine issue of material fact, as Your Honor noted, but the fact must be within the plaintiff's personal knowledge, and the testimony must not be merely self-serving. It must contain sufficient detail. Oh, yeah, but that has nothing to do with something that's inconsistent with the complaint. Pardon me? That's not my question. No. No inconsistency is even required in the statement that's being made by the Ninth Circuit in One Parcel of Real Property. It's simply a convenience- But, of course, any affidavit by a party is going to be self-interested. And if the rule is that a self-interested, self-serving affidavit can be disregarded, there are going to be an awful lot of cases that get thrown out. Well, if it's unsubstantiated by any other evidence, and it involves matters that are not within the declarant's personal knowledge, here, whether or not Rebecca and Andrew were monitored- They were parties to the conversation. You know, they were- Their test of their- This is what occurred during that conversation. Indeed, Your Honor. And I would submit that that testimony, which is in the record excerpts, speaks for itself. I mean, it's- I disagree with some of- a good portion of what my colleague said, characterizing that testimony. But it's an ascertainable fact that this Court can review. And one aspect of it that failed the summary judgment test was just how nonspecific it was. It's like, oh, I heard a- maybe it was a click, or voices, or some rubbing sound, and I became concerned, and I asked, and she told me, well, yes, you know, some calls are monitored, and this one might be. That's Andrew. But I don't remember specifically what was said. And Rebecca's testimony, if the Court will review what's in the record, suffers from the same nonspecificity. And she talks a lot about recording. Recording is no longer in this case. The recording claims have been dropped. But she- the amended complaint, which was very specific about her, the allegations were at no time, at no time- You know, I'm reading Rebecca. I'm on page 1252 and 1253. After I asked, I'm on line 24 on 1252 of ER. After I asked, this is Rebecca, she said that they do monitor or record conversations. And I said, are you recording this conversation, or is someone listening? And she said, yes. And, Your Honor, on the following page, ER 1253, question, did she say that your call was being recorded? Answer, I don't recall if she said recorded. I know she said yes to someone was listening was my direct question. That's right. But you just said that she said something like somebody might be. No, she said that the person on the other end responded, yes, someone is listening. That's quite unambiguous on that point. At that particular point in her testimony, Your Honor. And is there anything contradicting that except for the complaint? Well, I think that some of the other testimony, like what I just read you, shows how nonspecific it is. And it's not- It's very specific as- Excuse me. Yes, I'm sorry. It's very specific as to listening. And I asked you, is there anything except what's in the complaint to contradict that? In terms of a statement from her, I'm not aware of any, Your Honor. Okay. So why doesn't this add up to a violation of the FDCPA? Well, for the reasons that- Why couldn't it, I should say. Why couldn't it? Business call monitoring is a practice that's been around quite some time. It was discussed at some length when the Unruh Act was passed in 1967. When Congress, a year after that, enacted Title III, the Wire Act, it was also a well-known practice. It's a practice that has social utility. It's often very pro-consumer. If you look at the FDCPA cases that are cited in the briefs that the parties have filed, oftentimes a recording of the call is the evidence that a plaintiff has that a violation occurred. Now, understanding that- So the claim here is that they're doing it, but not telling the consumer. Right. Well, there's no third- Or the debtor. There's no third party. I mean, when I call a business, I'm there to conduct my business with that entity. Well, you know, you call the bank or whatever, you call Bank of America, and they tell you right away, this call is monitored, or you call whoever, they tell you it's monitored. You know, they say it's for, what do they call it, for quality assurance purposes. Right. I guess, you know, you call anybody, they always tell you the call is monitored. Yes. But I guess in your industry, they don't do that? No, Your Honor, it's our position, and that is our policy, and that we do do that. It's a disputed issue because Mr. Thomason and Rebecca Thomason allege that they weren't told that. Wow. So that's, I guess, going to have to remain a disputed issue because it's- But your position is that that kind of monitoring is not, would not add up to a violation of the FDCPA? Correct. There's no third party. I mean, the violation is that someone else is listening. Well, it says it's concerned with deceptive practices. So this is not, in your view, this is not a deceptive, failure to disclose is not a deceptive practice. Under the FDCPA, there's no authority cited whatsoever to bring it within the statute that Mr. Shroth identified. Let's take the case that's as strong as they can make it, and I'm not asking you to agree to all this. I'm just taking the case that's, I think, as strong as they can make it. Their case is that in at least some instances, your client does monitor and doesn't tell the people that it monitors. And the reason it doesn't tell them that it's monitoring is that they tend to get better cooperation from the people who are talking to your client if the people don't know that they're being monitored. And if they told them that they were being monitored, they would not get the cooperation, they wouldn't get as much money. That's their case. They say it's deceptive because by concealing the fact that you are not, that you are monitoring, you are getting different behavior out of them that's behavior to your advantage. What's your response to that argument? There's no evidentiary support for that theory. No, I understand. I'm asking you to accept that that's true for the purpose of the question. I understand that that's, you can argue whether that's true, I understand that. But that's not my question. Well, the purposes of the FDCPA, among others, are to enable debtors to participate fully in the debt collection process. I thought it was for the collectors. Well, the Clark case, the Ninth Circuit case from 2006, states that the purpose of the FDCPA is to ensure that the least sophisticated debtor is able to understand, make informed decisions about, and participate fully and meaningfully in the debt collection process. And as I pointed out, if you look at a number of cases under the FDCPA, if there's been a recording made of the calls that are being challenged, that's often the plaintiff's best evidence. But you haven't got to my question. My question is, assuming that it's as I just described, why is that not deceptive? They are not being deceived about the character of any debt, of the debt, about any threats or any actions that might be or might not be taken by the debt collector. They're not being deceived about who the debt collector is. Are they being deceived about whether someone may be monitoring? They're not being deceived about whether a third party might be monitoring the call. I didn't say third party. You're putting words in my mouth. Are they being deceived about whether someone is monitoring? If they weren't told and they had a reasonable expectation that there's no monitoring happening, then the act of not telling them may deceive them about that act. But when we look at the Fair Debt Collection Practices Act and we look at the types of conduct that that section of the statute was designed to redress. But the statute says deceptive practice. I mean, I'm just looking at the statute. I understand you're right. I'm a firm adherent to Justice Scalia's style of doing law. So, I mean, if it's deceptive, it's deceptive. Well, not every violation of law comes into the Fair Debt Collection Practices Act. I mean, here's a good example, Your Honor, in the FOTI case, which is cited in our papers. That was a case that involved the practice of individual call center reps who work for the debt collector using pseudonyms on the phone. Like I could say, you know, call me Trevor. And, you know, if someone calls for Trevor, that's the name I'm going to use in my job. And that was challenged as a deceptive practice. Your Honor, it fits into your hypothetical well, because here debtors are being deceived about the name of the call rep they're talking to. And it was held in the FOTI case that that's not a deceptive practice under the Fair Debt Collection Practices Act, that what's important for the debtor to know is that they're talking to a debt collector agency. And the particular name or the particular individual with whom they're talking at the debt collector is not that important. Well, I can see why FOTI would come out that way, because while it is in some literal sense deceptive, that is to say, my name is John, I've told you my name is Trevor, the deception in no way alters the behavior of the debtor to the advantage of the collector. I agree with you, Your Honor. It's not material, even to the least sophisticated consumer. And if there was some extrinsic evidence here that showed that some significant fraction of the population at issue was deceived by this, I would have to start arguing a lot harder. But there was no evidence of that below. There were 18 assembly line declarations where some folks were asked to fill in the blanks. Some people did not fill in the blanks. Some people filled in the blanks with, well, from 2005 to the present, I think I had a conversation with G.C. Services. None of them gave a precise date. Right. And that was the only evidence that was put forward. And it was not sufficient under the law. And I think the Foti case speaks to us as well, in a larger sense, about many of the issues here. It's not material which particular individual at the company you're dealing with. And the fact that the company is monitoring its own calls and the social utility and the pro-consumer benefits that come from that practice have been recognized. And I think SEPA was designed to accommodate that in 1967, and the CPC writes that Your Honor mentioned a strong support for that. And I see my time has elapsed. Thank you, Your Honors. Any further questions from the bench? We took you over, but would you like a minute to respond? Yes, Your Honor, if I may. Yes, Your Honor. I just want to address the bona fide error defense that was raised by the court. The defendant never moved on that issue. We were denied our due process rights in responding to that, also the notice requirements, Rule 56. That argument being made, there is evidence in the record, substantial evidence in the record, that GC services, and this is kind of the point of what I was talking about before, they may claim they have a policy of advising consumers that the calls could be monitored or recorded, but in practice they don't do that. And that was the purpose of the 18 declarations. I could go back through the whole litany of what happened in this case, and if you'll see, the docket is massive. And I think that Mr. Arleo's declaration sort of stems from some of the frustrations we experienced during this case. However, they don't give the advisement. And the reason why they don't give it is because people hang up on them. And there is evidence before the court. Okay. We've got that part. Yeah. Okay. Thank you very much. Thank both sides for your argument. The case of Thomason v. GC Services Limited Partnership is now submitted for decision. We're going to take a ten-minute break, and we'll be back in ten.
judges: Fletcher, Paez, Duffy